CHRISTIANSEN LAW, PLLC
Stephen K. Christiansen (Nev. Bar No. 11081)
Anthony W. Stirling (Nev. Bar No. 9462)
311 South State Street, Suite 250
Salt Lake City, Utah 84111
Telephone: 801.716.7016
Facsimile: 801.716.7017
steve@skclawfirm.com
tony@skclawfirm.com

*Attorneys for Creditor Sean Hullinger*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: JEREMY BARRON ROBERTS and AMY RENAE LORIS ROBERTS, <br><br> Debtors. <br><br> ─────────────────── <br><br> SEAN HULLINGER, <br><br> Plaintiff and Creditor, <br><br> vs. <br><br> JEREMY BARRON ROBERTS, <br><br> Defendant and Debtor. | Case No. 2:24-BK-16773-abl <br><br> Chapter 7 <br><br> Adv. Proc. No. 25-01109-abl <br><br> **AMENDED COMPLAINT** |

Plaintiff Sean Hullinger, through counsel, complains against Defendant Jeremy Roberts, alleging and seeking relief as follows:

## **PARTIES**

1. Plaintiff, Sean Hullinger is a resident of Salt Lake County, Utah.

2. On information and belief, defendant Jeremy Roberts currently resides in the State of Nevada.

## **JURISDICTION AND VENUE**

3.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## GENERAL ALLEGATIONS

6.    This is a complaint for the determination of nondischargeability of a debt pursuant to 11 U.S.C. § 523(a).

7.    In 2019, the State of Utah enacted legislation legalizing medical cannabis.

8.    The first series of licenses available from the state under the new legislation was for the cultivation of marijuana for legal purposes.

9.    Hullinger and Roberts consulted for applicants under the first series of licenses. During that process they met Scott Ericson, former Deputy Director of Agriculture for the State of Utah.

10.    Hullinger and Roberts came to know and respect Ericson, and Ericson expressed similar mutual regard.

11.    The next series of applications available from the state under the new legislation was for the dispensing of marijuana for legal purposes.

12.    The application window for licenses to dispense marijuana opened on October 25, 2019.

13.    The night that the application window opened, Robert's called Hullinger and asked him to partner with him and Ericson to consult with clients applying for dispensing licenses. Hullinger specifically remembers Roberts beginning the phone call with the phrases "let's go!" and "we're getting the band back together."

2

14.     Roberts ended the phone call by telling Hullinger to "meet me at the office" the next morning. The "Office" referred to industrial space in Pleasant Grove that Roberts had leased, which became the headquarters of the partnership between Hullinger, Roberts, and Ericson.

15.     The morning after Hullinger's phone call with Roberts, Ericson called Roberts and stated that Roberts had also asked Ericson to partner with Hullinger and Roberts. In that phone call, Ericson stated that he "was not doing this unless it is a three-way split."

16.     On or around that day, Hullinger, Roberts, and Ericson met at the Office and began working together to consult with clients applying for dispensing licenses. In doing so, the three formed a partnership (the "Partnership") to consult with clients bidding on dispensing licenses.

17.     By forming this partnership, Hullinger, Roberts, and Ericson assumed fiduciary duties to each other.

18.     As mentioned above, Ericson was emphatic that the parties conduct business as a three-way partnership. At the outset of this endevor, Hullinger, Roberts, and Ericson discussed and agreed to a three-way partnership, with proceeds to be split three ways. Consistent with this agreement, Roberts told Hullinger and Ericson that he would split any proceeds he received on behalf of the partnership three ways. Thereafter, the parties conducted their business as if they were a three-way equal Partnership, with each partner receiving an equal cut of the profits.

19.     The application deadline was set for December 2, 2019. From the date the application opened, through October, November, and into December, the partners worked together tirelessly to prepare applications on behalf of their clients, regularly working at the Office until midnight.

20.     From the time they met in the Office, work was apportioned equally between all three partners based on their area of expertise: Roberts contributed his contacts and business

acumen; Hullinger provided legal analysis and writing ability; and Ericson, provided know-how from his prior experience as a former Utah state agency deputy director.

21. The partners decided together how to apportion the work. No one party told the others what to do.

22. Each license applicant or bidder entered into agreements with the Partnership that were negotiated by Roberts and paid certain fees comprising initial payments to commence work with provisions for additional payments upon the awarding of a license.

23. The Partnership performed significant work on behalf of its clients. The three members of the Partnership undertook a concerted effort, doing what was needed to be done, working long nights (often until midnight), holding numerous meetings, and working in favor of the Partnership clients to obtain the commonly determined result. The partners worked together to draft proposal language to be used in the applications. They reviewed the applications to ensure that they were compliant with applicable regulations. They addressed real-estate considerations, including to ensure that the applicant had a regulatory-compliant place of business that was sufficiently secure.

24. Hullinger, a lawyer by training (but not acting as a lawyer for the partnership or any partner), discussed with the other partners in the Partnership on multiple occasions potential other forms of organizing their efforts, including by forming an entity (as he and Roberts had done in other ventures over the course of their 10-year friendship). Hullinger communicated to Roberts and Ericson that if no written agreement was entered among them, the venture would be considered a partnership in which all three owned an equal share.

25. The Partnership never entered into a written agreement but continued forward with the understanding that they were jointly working together in furtherance of a common goal and would split any profits earned by the Partnership three ways.

4

26.    On December 2, 2019, six applications, one for each client bidding on available applications, were submitted to the State of Utah by the Partnership.

27.    On January 3, 2020, the State of Utah announced the successful bidders. One of the six bidders for whom the Partnership had prepared a submission, Curaleaf, was awarded a dispensing license for its dispensary in Lehi, Utah.

28.    The Partnership was introduced to Curaleaf by Ericson.

29.    On information and belief, the Partnership's fee that Roberts negotiated with Curaleaf consisted of an upfront payment of approximately $250,000; a $1.5 million payment once the license was awarded; and ownership interests in Curaleaf in an unknown quantity. On information and belief, the cash received was the smaller portion of the value of the fee, the interests in Curaleaf comprising the greater portion of the value of the fee.

30.    On information and belief, Roberts or his company, Native Ventures, either kept the payment of the Partnership fee or assigned the compensation he expected from Curaleaf to a third party, Who You Wit, LLC and never accounted for the money to Hullinger or Ericson. In so doing, Roberts either wrongfully took money belonging to the other partners, including Hullinger, or misappropriated money that had been entrusted to him on behalf of the partners.

31.    On February 19, 2020, Ericson initiated a discussion via email with Roberts and Hullinger about accounting to the Partnership for consideration received or to be received. Ericson also prepared a spreadsheet which he circulated for discussion about what he understood to be the payments owed to him and Sean. Roberts kept delaying discussion and never directly responded to his partners' request for information which only he possessed.

32.    On February 26, 2020, Hullinger emailed the partners to request an accounting of a $135,000 payment that should have come from a Partnership client in February 2020.

33.     In that same email, Hullinger stated that the Partnership was expecting another payment of approximately $110,000 on the coming Monday.

34.     Finally, Hullinger stated that there were several hundred thousand dollars that were not in the Partnership's "collective 'hands'" and that the Partnership needed to have a "unanimous understanding of what happened to them."

35.     On March 2, 2020, Ericson made demand on Roberts in writing by email to account to the Partnership for past monies received as well as periodic payments going forward that were either due or coming due. Specifically, he stated that both Ericson and Hullinger should have had a "disbursement" of "approximately $15,000."

36.     In that same email, Ericson asked about three payments from the "Chicago group" of $75,000 each. Ericson stated that Roberts had told the Partnership that he was waiting to hear back from the attorney for the Chicago group for information on the payments.

37.     Also on March 2, 2020, Hullinger sent an email putting each partner on notice that the current configuration of the Partnership was equal shares for each partner:

> The standard definition of a partnership, unless varied by a writing, would dictate that the payment belongs to each of us in equal amounts, so the amount due to each of us would be 1/3 of the payment.

38.     In a responsive email, Roberts did not deny the existence of the Partnership or the other Partners' claims for payment. Instead, he stated only "Let's discuss tomorrow."

39.     Despite numerous emails from Ericson and Hullinger to Roberts requesting their portion of the payments due to them from Curaleaf, Roberts kept dangling a carrot and engaging in delay tactics. First, he stated Curaleaf had not paid him.

40.     Then, later in the year he acted like payment was imminent by asking for a W-9 and an address to send stock certificates (part of the payment was in stock certificates). Still, at no

time, did Roberts provide an actual accounting of who would get paid what. Roberts never accounted to the Partnership for consideration received, and no accounting was ever provided.

41. Instead of passing money paid to the Partnership from Partnership clients on to the Partnership or the other partners, Roberts kept or directed the money to himself. Roberts did this intentionally, knowing of Hullinger and Ericson's entitlement to two-thirds (collectively) of the money Roberts took. Roberts took the money without just cause or excuse and with the intention to deprive the partners of the money.

42. On March 17, 2020, after two weeks of fruitless requests for an accounting, Ericson stated in writing that he was dissolving the Partnership.

43. Hullinger and Ericson subsequently retained counsel to pursue their claims against Roberts related to the Partnership. On information and belief, Ericson settled his claim by Roberts' agreeing to pay Ericson an agreed sum of money, memorializing the same in a nonconfidential settlement agreement, but Roberts defaulted on the agreement and has not paid Ericson the full amount agreed. Hullinger did not settle his claim with Roberts.

44. On information and belief, the value of the Curaleaf fee at the time it was negotiated was as much as $6.5 million.

45. On information and belief, Curaleaf now owns four of thirteen dispensaries in the State of Utah.

46. Based on Roberts' misconduct, Hullinger filed a lawsuit in Utah State Court on April 4, 2023. The complaint initiating the lawsuit is attached as Exhibit A.

47. After the Utah state case was filed, Roberts engaged in a lengthy pattern of delay tactics to conceal or deprive Hullinger of key information, which upon information and belief, includes books, documents, records, and papers, from which Robert's financial condition or business transactions might be ascertained.

7

48.     Specifically, on November 14, 2023, Plaintiff served his First Set of Discovery Requests to Defendant consisting of 17 interrogatories, 20 requests for production of documents, and one request for admission.

49.     On December 12, 2023, Defendant served a response to the single request for admission and in the same email, his attorney indicated that he would not be able to spend sufficient time with Defendant to gather the responsive information and documents to supplement Defendant's initial disclosures. Defendant's counsel also said he would meet with his client sometime after the first of the year and Plaintiff's counsel responded by asking for a fixed date by which Defendant would provide discovery responses. It was not until January 3, 2024, when Plaintiff asked for a meet and confer, did Defendant agree to provide responses by January 19, 2024.

50.     In the meantime, beginning in January 2024 and continuing to August 2024 when Defendant's counsel withdrew, Plaintiff tried repeatedly to secure dates for Defendant's deposition. Despite many requests and three fact discovery extensions, no depositions have been set, apparently due to opposing counsel's inability to get a definite response from Defendant. In addition, settlement was discussed but the parties were so far apart that Plaintiff made the decision to continue with litigation.

51.     Plaintiff's counsel also conferred in good faith by telephone with Defendant's counsel regarding the inadequate discovery responses Defendant initially been provided on January 19, 2024, with promises to update and supplement. Finally, Plaintiff's counsel began discussions with Defendant's counsel by phone on May 22, July 12, August 7, 15, and 16, 2024. Counsel also conferred by email on July 1 and July 26, 2024. After these repeated follow-up requests, months of granting extensions, and discussions with Defendant's counsel, Plaintiff received what was described by Defendant's counsel as a "partial supplemental response" which

was a "work in progress," unsigned and unverified. On August 16, 2024, after months of requests, Defendant identified only a few documents which were partially responsive. At this point, it soon became clear that the issue with getting information for the discovery responses was Defendant's refusal to cooperate with his own attorneys.

52.     On August 22, 2024, Defendant's counsel withdrew and the same day, Plaintiff served a Notice to Appear or Appoint Counsel on Defendant. Defendant has never entered an appearance nor did he hire new counsel to represent him in this matter. No additional discovery responses or documents were forthcoming so Plaintiff filed a Statement of Discovery Issues. Defendant never responded and the Court ruled on November 7, 2024, and ordered Defendant to provide complete responses within 10 days of the date of the Order, making them due on November 17, 2024.

53.     On November 14, 2024, Defendant sent an email to Plaintiff's counsel requesting an extension until December 2, 2024, which counsel granted. Defendant's stated reason for requesting the extension was a purported sinus infection for which he alleged his doctor prescribed home rest. Defendant also provided a doctor's note recommending home rest for his illness.

54.     Defendant's home is in Nevada and, as it turns out from Roberts' social media posts, Roberts was actually in Salt Lake City on November 14, 2024, that same day to attend an event at The Gateway, an outdoor mall and cultural center.

55.     In one video posted to social media, which was taken hours after Roberts said that he was committed to bed rest, Roberts can be seen walking around, having a good time, and interacting with others.

56.     On December 2, 2024, the newly extended and agreed due date of Defendant's responses, Defendant made another request for an extension due to further alleged illness along with another note from a physician in Nevada curiously dated the same day Defendant's responses

were due. Rather than staying at home to rest, Defendant had traveled back to Nevada from Utah since the prior extension was granted. This time, Plaintiff declined to give Defendant a further extension.

57. Defendant has never asked the Utah State court for relief from its Order. Neither has Roberts ever sought a protective order from that court or objected to Hullinger's discovery requests. To date, Roberts has not provided the information the Utah State court ordered him to provide.

58. Fact discovery has been extended four times in the Utah case. A deadline is of January 31, 2025 was set in the Utah case. However, instead of providing the information Hullinger sought, Roberts filed for bankruptcy in this Court on December 27, 2024.

**FIRST CAUSE OF ACTION**
**(Determination of Nondischargeability of Debt Under 11 U.S.C. § 523(a)(4))**

59. All other paragraphs are incorporated herein.

60. By entering into a partnership with Hullinger, Roberts assumed fiduciary duties to Hullinger, including a duty to hold all money received from partnership efforts in trust for the benefit of all partners.

61. Roberts was aware of the duties and obligations he had assumed to his partners.

62. Roberts' actions described above were done while acting in a fiduciary capacity and constitute fraud, defalcation, or embezzlement, or larceny.

63. Roberts conduct involved moral turpitude or an intentional or reckless wrong, including but not necessarily limited to bad faith, moral turpitude, or other immoral conduct, or consciously disregarding a substantial and unjustifiable risk that his conduct would turn out to violate a fiduciary duty, which involved a gross deviation from the standard of conduct that a law-abiding person would observe in Roberts's situation.

10

64.   As a result of his actions, Roberts is liable to and owes Hullinger a debt for the money and other assets Roberts took or embezzled that rightfully belong to Hullinger.

65.   Accordingly, Roberts' debt to Hullinger is non-dischargeable under 11 U.S.C. § 523(a)(4).

## SECOND CAUSE OF ACTION
### (Determination of Nondischargeability of Debt Under 11 U.S.C. § 523(a)(6))

66.   All other paragraphs are incorporated herein.

67.   Roberts conduct described above was willful, wanton, malicious, and oppressive.

68.   Specifically, Roberts knew that money received from Curaleaf belonged to the partnership and was required to be split equally among the partners. Despite this knowledge, Roberts intentionally and wrongfully took or embezzled the money without any just cause or excuse.

69.   Roberts' actions necessarily deprived Hullinger of the money and other assets to which he was entitled or otherwise caused Hullinger's harm.

70.   Accordingly, Roberts' debt to Hullinger is non-dischargeable under 11 U.S.C. § 523(a)(6).

## THIRD CAUSE OF ACTION
### (Determination of Nondischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A))

71.   All other paragraphs are incorporated herein.

72.   Alternatively, Roberts' activities and communications discussed above (including the communications described in paragraphs 13-16) to Hullinger created a false and misleading understanding of the nature of their business arrangement, including an understanding that Hullinger was a partner who would receive a one-third share of any money Roberts received from Curaleaf. Roberts' conduct, through which he obtained Curaleaf's money and other assets included false pretenses, false representations, and actual fraud.

11

73.    Hullinger relied on Roberts' activities and communications by providing substantial services related to the Curaleaf application (and other applications) and by foregoing other avenues for protecting his legal rights.

74.    Under the circumstances, Hullinger's reliance was justified.

75.    As a result of Hullinger's misleading activities and communications, Hullinger suffered a loss.

76.    Accordingly, Roberts' debt to Hullinger is non-dischargeable under 11 U.S.C. § 523(a)(2).

### PRAYER FOR RELIEF

WHEREFORE, Hullinger prays for judgment in his favor and against Roberts as follows, subject to the terms, conditions, and contingencies pleaded herein:

1.    A determination of the nondischargeability of the debt owed by Roberts to Hullinger as prayed for in the First, Second, and Third Causes of Action, together with a determination of the amount of compensatory damages comprising the debt.

2.    Interest, costs, and attorney fees as the same may be allowed by law.

3.    Such other and further relief as the Court deems just and equitable in the circumstances.

DATED this 24th day of June, 2025.

CHRISTIANSEN LAW, PLLC

/s/ Stephen K. Christiansen
Stephen K. Christiansen
Anthony W. Stirling
*Attorneys for Plaintiff*

12

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I am an employee of CHRISTIANSEN LAW, PLLC and that on June 24, 2025, I caused to be served a true and correct copy of the AMENDED COMPLAINT in the following manner:

[X]　　(ELECTRONIC SERVICE) Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

[ ]　　(UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first-class postage prepaid, at Salt Lake City, Utah, to the parties listed on the attached service list, at their last known mailing addresses, on the date written above.

[ ]　　(OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

[ ]　　(FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

DATED June 24, 2025.

　　　　　　　　　　　　　　　　　　　　　　　　/s/　　　Stephen K. Christiansen